HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARINE CARPENTERS PENSION FUND; and PACIFIC COAST SHIPYARDS PENSION FUND,<br><br>Plaintiffs,<br><br>v.<br><br>PUGLIA MARINE, LLC, a Washington limited liability company, et al,<br><br>Defendants. | CASE NO. 3:18-cv-05809 RBL<br><br>ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AN ORDER TO PAY, AND INJUNCTIVE RELIEF |

## INTRODUCTION

THIS MATTER is before the Court on Plaintiffs Marine Carpenters Pension Fund and Pacific Coast Shipyards Pension Fund's (the Funds) Motion for Partial Summary Judgment, an Order to Pay, and Injunctive Relief. Dkt. #19. This dispute originated when Puglia Engineering, Inc., purchased all the stock of San Francisco Ship Repair, Inc. (SFSR), quickly realized that the new venture was financially unsustainable, and then ceased all operations after just a few months. The Funds assert that the decision to pull the plug on SFSR amounted to a "complete withdrawal," which triggered withdrawal liability to pay any "unfunded vested benefits" to multiemployer pension plans. 29 U.S.C. § 1381.

The Funds assert that all Defendants are jointly and severally liable for Puglia Engineering and SFSR's withdrawal liability because they constitute a single "employer" under the Multiemployer Pension Plan Amendments Act (MPPAA). This is because, according to the Funds, each non-individual defendant is a "trade or business" under the "common control" of Neil Turney. *See* § 1301(b)(1). They also contend that Turney himself is jointly and severally liable as the sole proprietor of a business that leases property to Puglia Engineering. The Funds thus ask the Court to enter judgment in their favor for the outstanding amount of interim withdrawal liability payments, which comes to $1,034,184. The Funds also request an injunction ordering Defendants to make future interim withdrawal liability payments, which will come to roughly an additional $1.3 million before the parties engage in arbitration.

Defendants Puglia Marine, LLC, Puglia Engineering of California, Inc., Bari Marine Holdings, LLC, 1410 Thorne Road, LLC, and Neil Turney (collectively "the Control Group") do not oppose the assertion that they are one employer for purposes of withdrawal liability.[1] They are also relatively silent regarding whether they owe the amount of withdrawal liability claimed by the Funds. However, Defendants do ask the Court to adopt and apply an "equitable exception" to the MPPAA's requirement that withdrawing employers make interim payments until their liability can be litigated at arbitration. Defendants insist that several other circuits have wisely applied such an exception where making interim payments would irreparably harm the withdrawing employer. If the Court applies this exception, Defendants assert that their likely economic hardship supports denying the Funds' Motion or at least staying review pending arbitration.

---

[1] By referring to Defendants as the "Control Group," the Court does not automatically assume that all Defendants are under "common control" for purposes of withdrawal liability under the MPPAA. *See* 29 U.S.C.A. § 1301(b)(1). That is one of the substantive legal issues that will be addressed in this Order.

# BACKGROUND

Puglia Engineering is a third-party Washington corporation with 100% of its stock owned by its president, Neil Turney. Dkt. #18, at 8. On December 1, 2016, Puglia Engineering entered into a stock purchase agreement with BAE Systems Ship Repair, Inc. Through this agreement, Puglia Engineering obtained ownership of 100% of the stock of SFSR, a subsidiary of BAE Systems Ship Repair. However, a mere four days after Puglia Engineering took possession of the shipyard on January 2, 2017, it became clear that at least $15 million worth of repairs would be necessary to continue the venture. Rather than expend this large amount, Puglia Engineering ceased operating the shipyard on May 28, 2017.

Before Puglia Engineering purchased its stock, SFSR was signatory to two collective bargaining agreements. The first was with Carpenters Local Union 2236, affiliated with the Northern California Regional Council of Carpenters. The second was with the Bay Cities Metal Trades Council of the Metal Trades Department, AFL-CIO. Each CBA respectively required SFSR to report and pay pension contributions to the Marine Carpenters Pension Fund and the Pacific Coast Shipyards Pension Fund for each hour of covered work performed by union employees. SFSR reported and paid pension fringe benefit contributions to these funds after the CBAs were executed.

When Puglia Engineering took ownership of SFSR's stock on December 1, 2016, it also adopted the terms and conditions of all the union contracts to which SFSR was bound. Dkt. #22, Ex. 5, at ¶ 9.06. Specifically, the purchase agreement states that the Puglia Engineering shall have "sole responsibility for all Liabilities arising under each such Union Contract and Benefit/Pension Plan" and explicitly releases SFSR from "any obligation or Liability . . . ." *Id*.

Although Puglia Engineering reported and paid fringe benefit contributions to the Funds while operating SFSR, this stopped once SFSR was shut down.

In April of 2017, both Puglia Engineering and SFSR filed for Chapter 11 bankruptcy protection. *See In re Puglia Engineering, Inc.*, United States Bankruptcy Court, Western District of Washington, Case No. 18-41324 BDL; *In re San Francisco Ship Repair, Inc.*, United States Bankruptcy Court, Western District of Washington, Case No. 18-41350 BDL. On April 20, 2018, the Funds filed proofs of claim in both bankruptcy proceedings claiming ERISA withdrawal liability. Dkt. #23, Exs. 14 & 15. The Marine Carpenters Pension Fund claimed it was owed a total of $2,170,785.00, with quarterly payments of $49,520.00. Dkt. #14, Ex. 18. The Pacific Coast Shipyards Pension Fund claimed it was owed $14,887,521.00, with quarterly payments of $295,208.00. Dkt. #23, Ex. 15.

In addition to owning all of Puglia Engineering's stock, Neil Turney also owns 100% of the stock in Puglia Engineering of California, Inc., and is the sole member of Puglia Marine, LLC, Bari Marine Holdings, LLC, and 1410 Thorne Rd., LLC. Dkt. #18, at 8; Dkt. #23, Exs. 8 & 9. Turney also owns two parcels of real property in Tacoma, WA, that he leases to Puglia Engineering. Dkt. #23, Ex. 10. On May 7, 2018, the Funds sent written demands for payment of withdrawal liability to several of the non-bankrupt members of the Control Group, including Puglia Marine, LLC, Puglia Engineering of California, Inc., and 1410 Thorne Rd., LLC. Dkt. #23, Exs. 18 & 19. The letters stated the amounts owing and that payment was due within 60 days of receipt.

After the members failed to pay by July 8, 2018, the date that the first installment was due,[2] the Funds sent two additional letters notifying the members of the Control Group that they were in default. Dkt. #23, Ex. 20; Dkt. #23, Ex. 21. However, the quarterly installments due on October 8, 2018, and January 8, 2019, were also not paid, and no payments subsequent to those dates have been made either. Dkt. #23, at ¶¶ 10-14; Dkt. #22, at ¶ 12. The Funds filed this action in October, 2018, to compel payment by the Control Group. Dkt. #1. The Control Group demanded arbitration on November 21, 2018. Dkt. #23, at ¶ 12.

In his declaration, Turney states that Puglia Engineering has not yet confirmed a plan of reorganization but that its assets are more than fully encumbered by the secured claims of Washington Federal Bank. Dkt. #32, at 2. Further, as a personal guarantor of Puglia Engineering's obligations, Turney asserts that his personal assets are also encumbered. *Id*. at 3. Turney thus states that being ordered to make the interim payments on the Control Group's withdrawal liability would effectively force him into personal bankruptcy and result in little being actually paid to the Funds. *Id*. at 4.

## DISCUSSION

**1. Legal Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty*

---

[2] This date was calculated by adding 60 days to the date the first non-bankrupt Control Group member received the Funds' demand letters, which was May 8, 2018. Dkt. #23, at ¶ 7.

*Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24. There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). Once the moving party has met its burden, the non-movant must then produce concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson*, 477 U.S. 242, 248 (1986).

## 2. Collecting Withdrawal Liability under the MPPAA's Scheme

"The MPPAA amendments to ERISA provide, in part, that '[i]f an employer withdraws from a multiemployer [pension] plan in a complete withdrawal ..., then the employer is liable to the plan' for 'withdrawal liability.'" *Resilient Floor Covering Pension Tr. Fund Bd. of Trustees v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1086 (9th Cir. 2015) (quoting 29 U.S.C. § 1381(a)); *Carpenters Pension Trust Fund for N. California v. Underground Const. Co., Inc.*, 31 F.3d 776, 778 (9th Cir.1994). Liability is triggered when "an employer permanently terminates its obligation to contribute or ceases all operations covered by the plan," *Carpenters*

*Pension Tr. Fund for N. California v. Underground Const. Co.*, 31 F.3d 776, 778 (9th Cir. 1994) (citing 29 U.S.C. § 1383(a)), and consists of the amount of "unfunded vested benefits" calculated pursuant to 29 U.S.C. §§ 1381 and 1391.

It is the pension plan's responsibility to determine the withdrawal liability, demand payment from the employer, and collect the amount. § 1382; § 1399(a), (b). The employer must begin making payments to the plan within 60 days of receiving a demand. § 1399(c)(2). "In the event of a dispute over employer withdrawal liability, the MPPAA mandates arbitration proceedings" that must be initiated within the time limits specified by the statute. *CMSH Co. v. Carpenters Tr. Fund for N. California*, 963 F.2d 238, 239 (9th Cir. 1992); § 1401(a). If the employer fails to initiate arbitration pursuant to § 1401(a), the amount of withdrawal liability demanded by the plan "shall be due and owing on the schedule set forth by the plan sponsor." § 1401(b)(1). Even if the employer disputes withdrawal or the amount of liability and timely initiates arbitration, they still must continue to make interim payments pending arbitral proceedings. § 1401(d). In other words, the MPPAA establishes a "pay now, dispute later" system. *Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 726 F.3d 738, 752 (6th Cir. 2013).

Upon a motion, courts are empowered to compel an employer to make interim withdrawal liability payments if they have failed to do so within the time prescribed. *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991); *Trustees of Amalgamated Ins. Fund v. Geltman Indus., Inc.*, 784 F.2d 926, 931 (9th Cir. 1986); 29 U.S.C. § 1451(b) & (c). "The plan sponsor need show only that it made a demand for interim payments under 29 U.S.C. § 1382 and that the payments were not made." *Galgay*, 105 F.3d at 139. Under

§ 1451(a), unpaid withdrawal liability is "treated in the same manner as a delinquent contribution," meaning § 1132(g) governs the damages available to a plaintiff.

Prior to arbitration, courts may decide "jurisdictional issues, such as whether the MPPAA applies," and the issue of "whether a defendant is an employer under the MPPAA." *Irigaray Dairy v. Dairy Employees Union Local No. 17 Christian Labor Ass'n of the United States of Am. Pension Tr.*, 153 F. Supp. 3d 1217, 1257 (E.D. Cal. 2015). However, "[i]ssues concerning whether an employer has withdrawn from a plan and, if so, the amount of withdrawal liability are committed to arbitration." *Id.*

**3.      Outstanding Interim Withdrawal Liability Payments**

*a.      Statutory Notice Requirements*

The Funds suggest that the April 20 proofs of claim served as a demand for payment of withdrawal liability, but also acknowledge that the Ninth Circuit has not decided whether proofs of claim amount to a demand under the MPPAA. Consequently, the Funds primarily rely on the May 7 letters to start the 60-day clock for purposes of interim withdrawal liability payments. The Control Group makes no arguments in opposition.

"In order to satisfy the statutory requirements, a notice and demand must include the amount of the liability, a schedule of payments and a demand for payment; it must also be sent 'to the employer.'" *Chicago Truck Drivers v. El Paso Co.*, 525 F.3d 591, 598 (7th Cir. 2008) (quoting 29 U.S.C. § 1399(b)(1)). "When a schedule does not specify the date when the first installment is due, the first installment would presumably be due sixty days after the notice was received." *Id.* at 598 n.2. In addition, "notice to the withdrawing employer is notice to all members of the controlled group for the purposes of 29 U.S.C. § 1399(b)(1)." *Teamsters Pension Tr. Fund-Bd. of Trustees of W. Conference v. Allyn Transp. Co.*, 832 F.2d 502, 507 (9th Cir.

1987); *see also Bd. of Trustees of W. Conference of Teamsters Pension Tr. Fund v. Salt Creek Terminals, Inc.*, No. C85-2270R, 1986 WL 21503, at *3 (W.D. Wash. Feb. 6, 1986) (holding that notice to one member of a control group constitutes notice to all members). While the Ninth Circuit has not decided whether a proof of claim may serve as a demand for payment under § 1399(a), the Third Circuit and at least one Western District of Washington court have treated it as such. *See El Paso*, 525 F.3d at 598; *Salt Creek Terminals*, 1986 WL 21503, at *2-3.

Here, the proofs of claim filed in the Puglia Engineering and SFSR bankruptcy proceedings likely served as demands for payment under § 1399(b)(1). However, even if they did not, the July 8 date for the first interim payment was calculated based on the date that non-bankrupt Puglia Marine, LLC, received a demand letter from the Funds. Dkt. #23, at ¶ 7. The Court therefore need not decide whether a proof of claim is equivalent to a demand under the MPPAA. This letter served as notice to all member of the Control Group that were jointly and severally liable with the withdrawing entity under the MPPAA. The letter also contained all the necessary information, including the amount due and the time within which the recipient must pay. Consequently, the Funds made a timely demand that was received on May 8, fixing the first interim payment date at July 8, 2018.

b. *The "Employer" subject to Withdrawal Liability*

The Funds argue that, under MPPAA, the four non-individual Defendants are under the "common control" of Neil Turney and are thus jointly and severally liable for Puglia Engineering's withdrawal liability. 29 U.S.C. § 1301(b)(1). The Funds also contend that Turney himself is the sole proprietor of a "trade or business" that leases property to Puglia Engineering, making him jointly and severally liable for Puglia Engineering's withdrawal liability as well. *Id.* Defendants offer no counterarguments.

For purposes of collecting withdrawal liability, the MPPAA's definition of an "employer" spans beyond the entity that actually withdrew from the plan. *Auto. Indus. Pension Tr. Fund v. Tractor Equip. Sales, Inc.*, 73 F. Supp. 3d 1173, 1179 (N.D. Cal. 2014). "Under the section 1301(b)(1) framework, withdrawal liability may be imposed against an entity other than the one obligated to contribute to the pension plan so long as: (1) the entity is under 'common control' with the withdrawing entity; and (2) the entity is a 'trade or business.'" *Id*. at 1180 (quoting 29 U.S.C.A. § 1301(b)(1)). All entities that satisfy these requirements are jointly and severally liable for withdrawal liability. *Bd. of Trustees of W. Conference of Teamsters Pension Tr. Fund v. Lafrenz*, 837 F.2d 892, 893 (9th Cir. 1988).

"Common control for purposes of Section 1301(b) is defined in 26 C.F.R. 1.414(c)–2 and 1.414(c)–4." *Auto. Indus. Pension Tr. Fund v. Fitzpatrick Chevrolet Inc.*, 833 F. Supp. 2d 1162, 1164 (N.D. Cal. 2011); *Bd. of Trustees of W. Conference of Teamsters Pension Tr. Fund v. Lafrenz*, 837 F.2d 892, 893 (9th Cir. 1988). "Common control requires that the same group of people or organizations (1) own a controlling interest in each business alleged to be under common control, and (2) accounting only for identical ownership, the same group of people or organizations are in effective control of each business alleged to be under common control." *Fitzpatrick*, 833 F. Supp. 2d at 1165 (citing 26 C.F.R. § 1.414(c)–2(a), (c)). A "controlling interest" is defined as "ownership of stock possessing at least 80 percent of total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation." *Id*. (quoting § 1.414(c)–2(b)(2)(A)). "Effective control" means possession of "more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of such corporation." *Id*. (quoting § 1.414(c)–2(c)(2)(i)).

Effective control is determined by "identical ownership," which is "the lowest common amount of individual ownership in all organizations alleged to be in common control." *Id*. at 1165-66 (citing § 1.414(c)–2(e)).

Courts have defined the term "trade or business" rather generously. *Board of Trustees of Western Conference of Teamsters Pension Trust Fund v. H.F. Johnson Inc.* established that individuals may be on the hook for a withdrawing entity's liability if they control the entity and are joint venturers in a separate business operation. 830 F.2d 1009, 1014-15 (9th Cir. 1987). The court explained that the individual defendants' liability was not based on their status as shareholders in the withdrawing corporation. *Id*. at 1015. Instead, liability sprung from their status as partners in the joint venture, which created personal (rather than limited) liability for obligations of the partnership. *Id*. In *Lafrenz*, the court extended this reasoning to apply to sole proprietors as well. 837 F.2d at 895; *see also Carpenters Pension Tr. Fund for N. California v. Lindquist*, No. 10-3386 SC, 2011 WL 2884850, at *5 (N.D. Cal. July 19, 2011), *aff'd*, 491 F. App'x 830 (9th Cir. 2012). The court held the individual defendants liable as sole proprietors of an unincorporated dump truck leasing operation that leased trucks to the withdrawing entity, which was controlled by the defendants. *Lafrenz*, 837 F.2d at 895.

However, courts have recognized that there can be a fine line between passive investments and engaging in a "trade or business." *See id.* at 894 n.7. In *Tractor Equipment*, for example, the court declined to find that the defendants' conduct of leasing out three properties was a "trade or business" because it had no relation to the withdrawing entity. 73 F. Supp. 3d at 1186-90. In the absence of such an economic nexus, the court concluded that there was less risk that the defendants were attempting to "fractionaliz[e] operations into many separate entities," the practice that § 1301(b)(1) was intended to prevent. *Id*. at 1190. The court also observed that

the defendants did not lease the properties "in the name of a formally recognized business organization," did not conduct frequent real estate transactions or advertise, and spent a minimal amount of time managing and maintaining the properties. *Id*. at 1188. The court therefore held that leasing the properties was a passive investment. *Id*. at 1190.

Here, Turney has "common control" of all the Defendant businesses. He is the sole member of Puglia Marine, LLC, 1410 Thorne Road, LLC, and Bari Marine Holdings, LLC. Dkt. #18, at 8; Dkt. #23, Exs. 8 (2017 Annual Report for 1410 Thorne Road, LLC) and 9 (Initial Report for Bari Marine Holdings, LLC). He also owns 100% of the stock in Puglia Engineering of California, Inc. Dkt. #18, at 8. As registered businesses, these entities qualify as "trade[s] or business[es]" under § 1301(b)(1) for obvious reasons. Consequently, these four Defendants are part of the Control Group and are jointly and severally liable with Puglia Engineering.

Turney himself is also the sole proprietor of a "trade or business" engaged in leasing property. Turney has admitted that he owns two properties in Tacoma, WA, that he leases to his company, Puglia Engineering. *Id*. at 8-9; Dkt. #23, Ex. 10 (Pierce County assessor of property summaries for parcels at 1125 Thorne Rd. and 2216 E.11th St.). This creates the type of economic nexus between Turney's leasing activities and the withdrawing entity that gave rise to a "trade or business" in *Lafrenz*. Turney has submitted no contrasting evidence that would suggest his leasing is merely a passive investment similar to *Tractor Equipment*. Turney is thus a member of the Control Group as a sole proprietor and jointly and severally liable for Puglia Engineering's obligations to the Funds.

c.   *Equitable Exception*

Rather than argue that they are not a single "employer" under the MPPAA, the Control Group urges the Court to adopt an "equitable exception" that would excuse employers from

making interim withdrawal liability payments before arbitration if doing so would cause them irreparable harm. The Control Group acknowledges that the Ninth Circuit has not applied such an exception in the past but points to other circuits that have and argues that the facts of this case call for a similar approach. The Funds respond by emphasizing that the Court should not deviate from Ninth Circuit precedent. The Funds also contend that the cases cited by Defendants either equivocate about whether they really establish an equitable exception or additionally require an employer to show that the claims against them are without merit.

Courts have generally developed two forms of irreparable injury exceptions to the MPPAA's "pay now, dispute later" system. *See Findlay Truck Line*, 726 F.3d at 752. Only the Fifth and Seventh Circuits have adopted an exception that fully excuses the employer from making interim payments pending arbitration. However, in addition to requiring that the employer would suffer irreparable financial harm if forced to make payments, those circuits only "excuse payments of interim withdrawal liability" if the pension plan's claim appears "frivolous or not colorable." *Trustees of Plumbers & Pipefitters Nat. Pension Fund v. Mar-Len, Inc.*, 30 F.3d 621, 626 (5th Cir. 1994); *Trustees of Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Cent. Transp., Inc.*, 935 F.2d 114, 119 (7th Cir. 1991). A claim is only frivolous "if the arbitrator is almost certain to rule for the employer." *Chicago Truck Drivers*, 935 F.2d at 119. This narrow exception exists to "ensure that the courts are not used by an unscrupulous pension fund lacking a legitimate withdrawal liability claim to squeeze money from an employer and propel it into bankruptcy." *Galgay*, 105 F.3d at 141.

Other circuits, including the Ninth Circuit, have applied an exception to ERISA's administrative exhaustion requirement that allows an employer to present their arguments against withdrawal liability directly to a court if arbitration would cause irreparable injury. *See, e.g., Bd.*

*of Trustees of Const. Laborers' Pension Tr. for S. California v. M.M. Sundt Const. Co.*, 37 F.3d 1419, 1420-21 (9th Cir. 1994); *Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia*, 830 F.2d 1241, 1249 (3d Cir.1987); *T.I.M.E.-DC, Inc. v. New York State Teamsters Conference Pension & Ret. Fund*, 580 F. Supp. 621, 633 (N.D.N.Y.), *aff'd*, 735 F.2d 60 (2d Cir. 1984) (also discussing irreparable harm in the context of a preliminary injunction). "Under ERISA, disputes which arise under 29 U.S.C. §§ 1381–99 are to be resolved through arbitration." *M.M. Sundt Const.*, 37 F.3d at 1420. Courts have generally treated this as an administrative exhaustion requirement that employers must satisfy before they can seek judicial review. *Id.*; *ILGWU Nat. Ret. Fund v. Levy Bros. Frocks*, 846 F.2d 879, 886 (2d Cir. 1988); *Flying Tiger*, 830 F.2d 1241, 1252 (3rd Cir.1987). "Exceptions to exhaustion requirements are usually limited, and apply only in extraordinary circumstances, such as, when the arbitral process would be futile or would cause the plaintiff irreparable injury." *M.M. Sundt Const.*, 37 F.3d at 1421. Examples of courts actually applying this exception in the MPPAA context are few and far between. In the Ninth Circuit they are nonexistent.

Neither of these exceptions would allow the Court to simply excuse interim withdrawal liability payments under these circumstances. First, even if the Court were to adopt the exception applied in the Fifth and Seventh Circuits, the Control Group would not qualify because the Funds' claims are not frivolous. The Control Group's brief contains just a few sentences arguing that the assessed withdrawal liability is unwarranted. Their primary argument is that "the sales transaction [between Puglia Engineering and BAE] should be ignored for purposes of withdrawal liability calculation" under § 1392(c). Dkt. #31, at 10. Section 1392(c) provides, "If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."

However, courts have interpreted § 1392(c) to "allow[] plaintiffs to reach the assets that were transferred in order to evade or avoid liability, *as well as the parties to whom they were improperly transferred.*" *Cent. States, Se. & Sw. Areas Pension Fund v. B&M Marine Constr., Inc.*, No. 16-CV-2743, 2018 WL 318483, at *6 (N.D. Ill. Jan. 8, 2018) (emphasis added); *see also IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993). Consistent with this, courts in the Ninth Circuit have applied § 1392(c) to *broaden* the options for a pension plan seeking to collect withdrawal liability, not narrow them. *See, e.g., Bd. of Trustees of Employers-Shopmen's Local 516 Pension Tr. Through Galton v. Columbia Wire & Iron Works, Inc.*, 233 F. Supp. 3d 873, 881 (D. Or. 2017); *Bd. of Trustees of Butcher & Provision Workers Pension Fund of S. California v. Specialty Meats, Inc.*, No. CV1301995MMMPJWX, 2013 WL 12116381, at *5 (C.D. Cal. Sept. 30, 2013); *Cuyamaca Meats, Inc. v. San Diego & Imperial Ctys. Butchers' & Food Employers' Pension Tr. Fund*, 827 F.2d 491, 499 (9th Cir. 1987). In the absence of contrary authority, it is clear that the Funds' claims are not frivolous.[3]

The Control Group argues that *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115 (4th Cir. 1991) and *Giroux Bros. Transp. v. New England Teamsters & Trucking Indus. Pension Fund*, 73 F.3d 1 (1st Cir. 1996) recognized an equitable exception for irreparable injury that did not require showing frivolousness as well. However, the Control Group's reliance on these cases is misplaced. Both cases discussed an equitable exception to the requirement to pay withdrawal liability only in dicta because the facts made an exception clearly inapplicable. *Centra*, 947 F.2d at 120; *Giroux*, 73 F.3d at 5. In addition, because the cases did not actually apply the exception, it is unclear what effect it would have had.

---

[3] Defendants also argue that 29 U.S.C. § 1405(b) "would limit the Defendants' liability in bankruptcy liquidation, if bankruptcy liquidation were forced on the Defendants by the Pension Funds." Dkt. #31, at 10. However, this argument has little to do with whether Defendants are currently liable for the amount of withdrawal liability claimed by the Funds.

Second, the exhaustion requirement exception for irreparable injury does not align with the relief that the Control Group requests, which is that the Court "deny Plaintiff's Motion or stay its review pending the arbitrator's determination." *See* Dkt. #31, at 10, 11. Allowing this result would be the opposite of an exception to the exhaustion requirement, since the Control Group still wishes to engage in arbitration. In addition, simply delaying payment because financial injury is likely "would precisely contradict the congressional purpose of protecting funds from undercapitalized or financially precarious employers . . . ." *Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 726 F.3d 738, 754 (6th Cir. 2013); *see also Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137, 141 (3d Cir. 1997) ("We believe that it would contort the law if we were to allow the undercapitalized or financially precarious companies that pose the very risk to pension funds that MPPAA was designed to correct to defer payment because they pose that risk."); *Boland v. Wasco, Inc.*, 50 F. Supp. 3d 15, 19 (D.D.C. 2014) ("The Supreme Court has cautioned that equitable discretion must not frustrate Congress's ends."). In short, the relief the Control Group wants is unavailable and the Court will not unilaterally grant different relief that has not been requested.

Even if the Court were inclined to apply the irreparable harm exception to ERISA's exhaustion requirement in a more traditional manner, the Control Group has not provided the basis for doing so. In the few cases to have applied this exhaustion exception in the MPPAA context, courts have coupled their analysis of irreparable harm with a discussion of the employer's likelihood of success on the merits. *See, e.g., T.I.M.E.-DC, Inc. v. New York State Teamsters Conference Pension & Ret. Fund*, 580 F. Supp. 621, 626, 632-33 (N.D.N.Y.); *T.I.M.E.-DC, Inc. v. I.A.M. Nat. Pension Fund*, 597 F. Supp. 256, 262, 264 (D.D.C. 1984). In *New York State Teamsters*, for example, the court held that collection of interim payments should

be enjoined because the employer was likely to succeed in their argument that withdrawal liability was not triggered when the employer ceased contributions during a labor dispute. 580 F. Supp. at 626-31 (citing 29 U.S.C. § 1398).[4] Here, the Control Group has not moved for an injunction or provided any compelling argument that withdrawal liability was improperly assessed. Consequently, the Court will not excuse the Control Group from ERISA's administrative exhaustion requirement.

**4.  Injunctive or Other Equitable Relief for Future Withdrawal Liability Payments**

In addition to requesting an order compelling delinquent payments, the Funds also ask the Court to issue an injunction ordering the Control Group to make future interim withdrawal liability payments under threat of sanctions. The Funds argue that they are likely to succeed on the merits if the Control Group fails to make future payments for the same reasons that they are entitled to judgment for the payments that are already delinquent. The Funds contend that they will suffer irreparable harm if they are forced to forego the additional $1.3 million dollars that the Control Group will owe over the next year. The Funds also argue that the equities are in their favor because the Control Group is rightfully obligated to make its future payments and that it is in the public interest to discourage employers from shirking their withdrawal liability responsibilities.

An injunction is improper in these circumstances for several reasons. First, while the Funds ask that the Court impose the threat of sanctions, holding the Control Group in civil contempt for failing to make payments would serve no valid purpose. "Civil contempt sanctions

---

[4] The Control Group boldly asserts that, in *T.I.M.E.-DC*, "the Second Circuit accepted irreparable injury as a **complete defense** to the plan's demand for interim payments of withdrawal liability." Dkt. #31, at 7 (emphasis in original). This mischaracterizes that case's holding. Although the court did discuss irreparable injury, it did so only as part of the standard injunction analysis and when considering whether to let the employer avoid the administrative exhaustion requirement. Section 1398 was the centerpiece of the court's holding.

ORDER ON PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT, AN ORDER
TO PAY, AND INJUNCTIVE RELIEF - 17

. . . are employed for two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992). Here, there would be no need to use additional fines to get the Control Group to abide by the court's order because the possibility of a judgment with interest, liquidated damages, and attorneys' fees is a natural deterrent. *See* 29 U.S.C. § 1132(g). Indeed, the injunction proposed by the Funds is similar to a guaranteed monetary judgment in the future, but courts cannot use sanctions to enforce monetary judgments. *See Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147 (9th Cir. 1983).

Civil contempt may also be used to "compensate the contemnor's adversary for the injuries which result from the noncompliance" with the court's order. *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983). However, the MPPAA already allows a pension plan to move for a court order compelling delinquent payments. 29 U.S.C. § 1451(b). There is no need for a plan to be compensated twice. It thus appears clear that the Court could not back up an injunction with sanctions. But without sanctions, an injunction of this nature would amount to little more than a declaratory judgment.

Second, injunctive relief is inappropriate when there has been no alleged violation of the law. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 193 (1978) (assuming that there must be a "violation of the law" before an injunction can issue). While the Control Group has already missed several of its interim payments, it has not missed the payments that the Funds seek an injunction for. Assessing the "likelihood of success on the merits" in these circumstances where the cause of action has not even accrued is a purely hypothetical exercise. *See Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7, 20 (2008); § 1451(b) (a plan may bring an action upon "failure of the employer to make any withdrawal liability payment within the time prescribed"). Enjoining

the Control Group here would be no different from ordering a party to a contract requiring monthly payments to pay the remaining installments. In both cases payment would be legally required, but an injunction would be unwarranted. Declaratory relief would be the proper remedy.

For these reasons, the Court denies the Funds' request for injunctive relief. However, the Funds are correct that, if the Control Group is required to make the interim payments it has already missed, it is also required to meet its future withdrawal liability obligations. Consequently, the Court will issue a declaratory judgment that the Control Group is legally obligated to timely provide future interim withdrawal liability payments.

**CONCLUSION**

The Funds' Motion for Partial Summary Judgment and an Order to Pay the amount of $1,034,184 [Dkt. #33] is GRANTED. The Court also grants the following declaratory relief: the Control Group is legally obligated to provide future quarterly interim withdrawal liability payments to the Funds, beginning April 8, 2019, and continuing each 90 days thereafter, until all quarterly payments are made, this matter is resolved through arbitration by way of an arbitration award, or through motions before the Court, whichever comes first. The issue of whether the Funds are entitled to interest, liquidated damages, and attorneys' fees and costs pursuant to 29 U.S.C. §§ 1332(g) and 1451(e) is reserved for further briefing.

IT IS SO ORDERED.

Dated this 10th day of April, 2019.

Ronald B. Leighton
United States District Judge

ORDER ON PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT, AN ORDER
TO PAY, AND INJUNCTIVE RELIEF - 19